IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Virginia Foster,                         )
                                         )        Civil Action No. 6:13-926-TMC-KFM
                   Plaintiff,            )
                                         )        **REPORT OF MAGISTRATE JUDGE**
        vs.                              )
                                         )
Carolyn W. Colvin, Acting                )
Commissioner of Social Security,[1]      )
                                         )
                   Defendant.            )
_____)

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on May 4, 2009, alleging that she became unable to work on February 17, 2009. The application was denied initially and on reconsideration by the Social Security Administration. On October 5, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Karl S. Weldon, an impartial vocational expert, appeared on

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

May 18, 2011, considered the case *de novo* and, on August 4, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 6, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> (2)    The claimant has not engaged in substantial gainful activity since February 17, 2009, the alleged onset date (20 C.F.R § 404.1571 *et seq*).
>
> (3)    The claimant has the following severe impairments: congestive heart failure, obesity, adenocarcinoma of the right breast, and status post mastectomy of the left breast (20 C.F.R. § 404.1520(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform reduced light work as defined in 20 C.F.R. § 404.1567(b). I specifically find the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently. She can stand or walk for 2 hours of an eight hour workday, and can sit for six hours of an eight hour workday. The claimant can occasionally push and pull with her upper extremities. She should never climb ropes, ladders, or scaffolds. The claimant can also occasionally climb, balance, stoop, kneel, crouch, and crawl. She can frequently engage in reaching and handling. The claimant should avoid concentrated exposure to temperature extremes, humidity and fumes, and hazards.
>
> (6)    The claimant is capable of performing past relevant work as a case worker. This work does not require the performance

2

of work-related activities precluded by the claimant's residual
functional capacity (20 C.F.R. § 404.1565).

(7)    The claimant has not been under a disability, as defined
in the Social Security Act, from February 17, 2009, through the
date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were

applied and whether the final decision of the Commissioner is supported by substantial

evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to

those persons insured for benefits, who are not of retirement age, who properly apply, and

who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. §

423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which
has lasted or can be expected to last for at least 12 consecutive
months.

To facilitate a uniform and efficient processing of disability claims, the Social

Security Act has by regulation reduced the statutory definition of "disability" to a series of

five sequential questions.  An examiner must consider whether the claimant (1) is engaged

in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that

equals an illness contained in the Social Security Administration's Official Listings of

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that

prevents past relevant work, and (5)  has an impairment that prevents him from doing

substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not

disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past

relevant work as it is customarily performed in the economy or as the claimant actually

performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there

4

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Prior to Alleged Onset Date*

The plaintiff was treated for right breast adenocarcinoma, which resulted in a right breast lumpectomy in 2003, and she developed heart issues from her chemotherapy (Tr. 105, 234-43, 259-60, 268). In late June 2008, Alejandro N. Lopez, M.D., evaluated the plaintiff as a followup to her cardiac issues (Tr. 274-78). He noted that the plaintiff was doing "fairly well" despite some shortness of breath (Tr. 274). He noted that her cardiac condition had symptoms that were "primarily Class II" heart failure symptoms.[3] Dr. Lopez ordered an echocardiogram, which showed an ejection fraction ("EF")[4] rate at 15-20% (Tr. 272-73).

On November 19, 2008, Steven W. Corso, M.D., evaluated the plaintiff and, upon examination, found an area of concern in the plaintiff's left breast (Tr. 259-61). Mammogram and ultrasound on December 1, 2008, were "highly suggestive of malignancy"

---

[3] According to the American Heart Association ("AHA"), the most commonly used classification system for heart failure is the New York Heart Association ("NYHA") Functional Classification, which places patients in one of four categories based on how much they are limited during physical activity. Under this classification, Class I heart failure encompasses "[p]atients with cardiac disease but resulting in no limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea or anginal pain." Class II heart failure encompasses "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." Class III heart failure encompasses "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." Class IV heart failure encompasses "[p]atients with cardiac disease resulting in inability to carry on any physical activity without discomfort. Symptoms of heart failure or the anginal syndrome may be present even at rest. If any physical activity is undertaken, discomfort increases." *See* AHA website (www.heart.org/HEARTORG/Conditions/ HeartFailure/ AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp#) (last visited July 7, 2014).

[4] The AHA states that a normal EF rate is between 55-70%; an EF between 40-55% indicates damage, perhaps from a previous heart attack, but it may not indicate heart failure; and a measurement under 40 may be evidence of heart failure or cardiomyopathy. *See id.* (www.heart.org/HEARTORG/Conditions/HeartFailure/SymptomsDiagnosisofHeartFailure/Ejection-Fraction-Heart-Failure-Measurement_UCM_306339_Article.jsp#) (last visited July 7, 2014).

(Tr. 261).  The plaintiff underwent a surgical biopsy of her left breast on December 9, 2008 (Tr. 307-23).

In January 2009, Dr. Lopez evaluated the plaintiff and noted that she had symptoms of both Class I and Class II heart failure (Tr. 268-70).  A stress test revealed that the plaintiff's EF rate had improved from approximately 20% in July 2008 (Tr. 269, 272) to 43% on January 19, 2009 (Tr. 292, 332, 350).  On February 3, 2009, the plaintiff had a regular heart rate and rhythm with no murmurs, rubs, or gallops; a myocardial perfusion scan with normal imaging and no ischemia; an EF of 43%; and no wall abnormalities (Tr. 332).  The plaintiff underwent a left total mastectomy on February 23, 2009 (Tr. 281-92).

***After Alleged Onset Date***

On March 9, 2009, the Director of Oncology and Endocrine Surgery, Richard K. Orr, M.D., M.P.H., F.A.C.S., evaluated the plaintiff after her surgery and stated that she was "doing well."  He ruled the plaintiff out for chemotherapy because of the potential link between her previous chemotherapy treatments and her heart condition (Tr. 345).  On March 17, 2009, the plaintiff was treated in the hospital for an infection in her left breast (Tr. 297-305).  On April 23, 2009, Michael J. Orseck, M.D. removed the plaintiff's infected left tissue expander (Tr. 324-27).

On June 23, 2009, Dr. Orr evaluated the plaintiff for swelling in her left arm. He noted that Dr. Orseck had to remove the plaintiff's prosthesis due to drainage.  Dr. Orr indicated that the plaintiff's lymphedema was likely due to congestive heart failure and referred her to the lymphedema clinic (Tr. 343-44).

On July 9, 2009, Dr. Lopez evaluated the plaintiff for a six month followup on her nonischemic cardiomyopathy (Tr. 348-49, 395-96).  Dr. Lopez found that the plaintiff was "feeling well" despite non-fluid-related weight gain and that she was not in acute distress and had no intercostal retraction or use of accessory muscles; no rales, rhonci, or wheezes; regular heart rhythm; normal apex impulse; normal heart sounds; normal

6

murmurs; no musculoskeletal difficulties; no vascular issues; normal neurological findings; no psychological abnormalities; and an EKG revealing sinus tachycardia with a heart rate of 110 (Tr. 348-49).  Dr. Lopez classified the plaintiff's condition as Class II heart failure (Tr. 349).  By July 21, 2009, Dr. Orr indicated that the plaintiff was "doing much better" with less swelling (Tr. 342).

On August 6, 2009, Dr. Lopez's nurse practitioner, Robin Simpkins, evaluated the plaintiff for a followup due to her medication, Coreg, causing her to "swell."  Ms. Simpkins noted that the plaintiff was "feeling quite well" and had been trying to lose weight by walking.  She had an improved heart rate on medication, a normal blood pressure, and completely denied chest discomfort, palpations, dizziness, or nocturnal shortness of breath (dyspnea[5] and/or orthopnea[6]).  The plaintiff had no acute distress, a normal heart rhythm, no intercostal retraction, no rales, no rhonci, and no wheezing.  She also had normal neurological, psychiatric, and musculoskeletal examinations (Tr. 346-47). On September 3, 2009, Ms. Simpkins noted very similar results, including that the plaintiff was "doing great," looked "great," was "very" compliant with her medication, had no chest discomfort or palpitation, and was exercising without issue (Tr. 378-79).

On October 8, 2009, Ms. Simpkins examined the plaintiff and found that she was "doing quite well" and was exercising without difficulty.  Her weight gain was attributable to her poor diet.  The plaintiff had a normal heart rhythm, no acute distress, no intercostal retraction, no rales, no rhonci, no wheezing, and normal neurological, musculoskeletal, and psychiatric examinations.  She noted that the plaintiff "continues to do well" (Tr. 376-77).

By November 17, 2009, Ms. Simpkins stated that the plaintiff was "doing amazingly well."  She again had no chest discomfort, no dyspnea, no edema, no

---

[5]  Dypsnea means "breathlessness or shortness of breath." *See Dorland's Illustrated Medical Dictionary*, 31st Ed. at 589 (2007).

[6]  Orthopnea is "dyspnea that is relieved by assuming an upright position." *See id.* at 1359.

palpitations, no dizziness, no shortness of breath, no acute distress, normal heart rhythm, and normal neurological, psychiatric and musculoskeletal examinations (Tr. 388-89).

On January 14, 2010, Dr. Orr examined the plaintiff and similarly found that she was "doing well" and that, from his point of view, she was "having no problems." She had no evidence of disease. He specifically noted that the plaintiff gave him a form from her attorney regarding disability. He stated, "Although it is possible that [she] is qualified for disability it is not related to her surgery as the surgery was almost a year ago. She needs to talk to other physicians who are more appropriate to address potential disability from medical issues" (Tr. 380).

On January 18, 2010, Dr. Lopez found that the plaintiff was again "doing well without any complaints of chest pain or chest tightness." He noted that her symptoms of mild dypsnea with exertion "are more consistent with Class I" heart failure (Tr. 385). The plaintiff again had a normal heart rhythm, normal palpitation, normal heart sounds, normal apex impulse, no murmurs, no acute distress, no intercostal retraction, no rales, no rhonci, no wheezing, and normal neurological, psychiatric and musculoskeletal examinations (Tr. 385-86). Dr. Lopez stated that the plaintiff was "doing well clinically" and "should continue with her current medication regime" (Tr. 386).

The next day, on January 29, 2010, Dr. Lopez completed a brief questionnaire that generally found that she would "most probably have to rest away" from her work area for more than one hour per day. Dr. Lopez did not answer a question related to the number of work days the plaintiff would likely miss each month and stated that he based his statements on the plaintiff's non-ischemic cardiomyopathy and previous tests (Tr. 427). He also checked a box indicating that, despite finding that the plaintiff had symptoms consistent with Class I heart failure the previous day, she had Class II heart failure (Tr. 428).

More than six months later on July 28, 2010, Ms. Simpkins examined the plaintiff and noted that she "felt great and is walking daily" (Tr. 383). The plaintiff continued

8

to have similar examination results while maintaining her low sodium diet and being compliant with medications, including having a normal heart rhythm, no chest discomfort, no palpations, no dizziness, or no shortness of breath, normal heart rhythm, no acute distress, no intercostal retraction, no rales, no rhonci, no wheezing, and normal neurological, psychiatric, and musculoskeletal examinations (Tr. 383-84). The plaintiff's next examination was approximately six months later on January 20, 2011, where Dr. Orr found no recurrence of her cancer (Tr. 440-41).

On February 9, 2011, Dr. Lopez examined the plaintiff for the first time in nearly one year (Tr. 430-33). Although she complained of some shortness of breath only on exertion and some dizziness upon standing, the plaintiff did not have any chest pain, had no orthopnea, and no syncope (Tr. 430). Dr. Lopez stated that her symptoms were more consistent with Class II heart failure. The plaintiff also continued to have normal heart rhythms, no palpations, normal apex impulses, normal heart sounds, no intercostal retraction, no acute distress, and normal musculoskeletal, vascular, neurological, and psychiatric examinations (Tr. 430-32). On February 18, 2011, the plaintiff's echocardiogram revealed moderate global hypokinesis (decreased mobility) with an estimated EF of 35-40%, left ventricular enlargement with depressed left ventricular systolic function, and no significant valvular abnormalities (Tr. 445-46).

On March 21, 2011, Dr. Lopez signed a written statement explaining the basis of his January 2010 questionnaire. He stated that he last treated the plaintiff in January 2010, and she was last seen in his office July 2010. He also explained that his (and Ms. Simpkins') notations regarding the plaintiff "doing well" (and similar notations) were meant to describe her progress for someone with her condition. He explained that the primary basis for his January 2010 findings were the "poor and stable" EF rates of 25% in May 2007 and 20% in July 2008 (Tr. 439). Dr. Lopez did not mention in his statement the

9

more recent EF findings of 43% on January 19, 2009 (Tr. 292, 332, 350) and 35-40% on February 18, 2011 (Tr. 445).

The most recent record in the transcript, a July 18, 2011, examination report by Dr. Orr, indicated that the plaintiff was "doing well at this time and not having any particular problems" (Tr. 464). The impression of the plaintiff's cancer was "No evidence of disease" (Tr. 464).

### State Agency Physician Opinions

On September 29, 2009, state agency consultant Xanthia Harkness, Ph.D., reviewed the plaintiff's medical records and completed a Psychiatric Review Technique ("PRT") Questionnaire regarding the plaintiff's alleged mental impairments (Tr. 352-65). Dr. Harkness found that the plaintiff's alleged mental impairments (depression and anxiety) were not "severe" impairments under the Act (Tr. 352, 364), as they caused no more than "mild" limitations in the functional areas of activities of daily living, social functioning, and concentration, persistence, and pace (Tr. 362, 364). She found no episodes of decompensation (Tr. 362).

On September 9, 2010, state agency consultant Lisa Varner, Ph.D., also completed a PRT Questionnaire and found that the plaintiff's mental impairments were not "severe" under the Act, as they caused no limitations (Tr. 405-18).

On September 29, 2009, state agency consultant Seham El-Ibiary, M.D., completed a Physical Residual Functional Capacity ("PRFC") Assessment, opining that the plaintiff could lift up to 20 pounds occasionally and ten pounds frequently and sit for six hours each in an eight hour workday, and stand/walk for at least two hours per day (Tr. 367). Dr. El-Ibiary opined that the plaintiff had some additional minor postural and manipulative limitations (Tr. 369-70). He also found that her symptoms should improve (Tr. 371).

10

On September 9, 2010, a PRT Questionnaire was completed by Lisa Varner, Ph.D., a non-examining doctor on contract to the Administration. Dr. Varner indicated that the plaintiff had medically determinable mental impairments of depression and anxiety causing no restriction in daily activities, no difficulties in social functioning, no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation (Tr. 405-18).

On September 15, 2010, state agency consultant Carl E. Anderson, M.D., also completed a PRFC Assessment and found very similar results as Dr. El-Ibiary had the year before, with slightly greater postural, manipulative, and environmental limitations (Tr. 419-26).

### *Vocational Testimony*

Vocational expert Carl Weldon testified that someone with the plaintiff's residual functional capacity("RFC") would be able to perform the functions of the plaintiff's past relevant work as a case worker, both as she performed it and as it was performed in the national economy (Tr. 107-08). He also testified that there would be other work in the national economy available for someone with the plaintiff's vocational factors and RFC, specifically the positions of order clerk and cashier II (Tr. 108). He further testified that adding functional limitations that were not incorporated into the RFC, including dizzy spells on a daily basis, resting away from the work station for more than an hour during the work day, and going to the bathroom every 30 minutes, would preclude other employment (Tr. 108-11).

## ANALYSIS

The plaintiff alleges disability commencing February 17, 2009, at which time she was 46 years old. She was 48 years old on the date the ALJ issued his decision. The plaintiff completed four years of college and worked as a Medicaid caseworker for the State of South Carolina from 1983 to 1999. The ALJ determined that the plaintiff had the RFC

to perform a reduced range of light work.  The plaintiff argues that the ALJ erred by (1) improperly giving little weight to the medical opinions of Dr. Lopez and (2) failing to include significant limitations resulting from the plaintiff's medications in the RFC assessment.

### Treating Physician

The plaintiff first argues that the ALJ erred in giving little weight to Dr. Lopez's medical opinions. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions

> are still entitled to deference and must be weighed using all of
> the factors provided in [20 C.F.R. § 416.927]. In many cases,
> a treating source's medical opinion will be entitled to the
> greatest weight and should be adopted, even if it does not meet
> the test for controlling weight.

*Id.* at *4.

As detailed above, on January 29, 2010, Dr. Lopez completed a brief questionnaire that generally found that the plaintiff would "most probably have to rest away" from her work area for more than one hour per day. Dr. Lopez did not answer a question asking whether the plaintiff would "most probably have to miss more than 3 days of work per month?." His only response was to insert a "?." Dr. Lopez stated that he based his statements on the plaintiff's non-ischemic cardiomyopathy and previous tests (Tr. 427). He also checked a box indicating that the plaintiff had Class II heart failure (Tr. 428). On March 21, 2011, Dr. Lopez signed a written statement explaining the basis of his January 2010 questionnaire. He stated that he last treated the plaintiff in January 2010, and she was last seen in his office July 2010. He also explained that his (and Ms. Simpkins') notations regarding the plaintiff "doing well" (and similar notations) were meant to describe her progress for someone with her condition. He explained that the primary basis for his January 2010 findings were the "poor and stable" EF rates of 25% in May 2007 and 20% in July 2008, both before her alleged onset of disability (Tr. 439). Dr. Lopez did not mention in his statement the more recent EF findings of 43% on January 19, 2009 (Tr. 292, 332, 350) and 35-40% on February 18, 2011 (Tr. 445).

The ALJ gave both statements "little weight" (Tr. 33-34) and gave the following reasons for discounting Dr. Lopez's opinions:

> 1) The inconsistency of Dr. Lopez's findings with the medical
> records, including records showing improvement and the lack
> of any functional limitations (especially heart-related limitations)
> in nearly all of her examinations;

13

2) The plaintiff's improved EF and functional abilities over time since her 2003 chemotherapy triggered her heart problems;

3) The absence of any records that the plaintiff needed emergency treatment or was in acute distress;

4) The plaintiff's daily activities (including making light breakfast, cooking, washing dishes, folding laundry, sweeping, dusting, cleaning the kitchen, driving, attending church, visiting family, occasionally grocery shopping and eating out, and attending a weekly concert) that do not cause her acute distress afterwards;

5) Dr. Lopez's March 2011 statement appeared to be prepared by the plaintiff's attorney in anticipation of litigation and occurred more than a year after he last treated the plaintiff, but was based on testing performed in 2007 and 2008 while ignoring more recent, improved results;

6) The plaintiff's medical professionals consistently stating that she was "doing well" and even "amazingly well" upon her conservative, routine treatment on a follow-up basis;

7) Dr. Lopez's classification of the plaintiff's heart disease as fluctuating between Class I or Class II heart disease, which indicates no more than "slight" limitations;

8) The plaintiff's ability to engage in physical activity, such as walking daily and other daily activities, without difficulty; and

9) Dr. Orr's refusal to complete a disability form on behalf of the plaintiff.

(Tr. 33-35).

The plaintiff first argues that "there is no indication of improvement in [her] condition to the level of ability to work" (pl. brief at p. 13). However, as the ALJ noted, the plaintiff's condition, including her EF, did show improvement over her earlier tests relied on by Dr. Lopez. The plaintiff's EF results in chronological order as follows: 25% in May 2007 (Tr. 439), 15-20% in July 2008 (Tr. 272), 43% in January 2009 (Tr. 267, 332), and 35-40% in February 2011 (Tr. 445-46). Her later electrocardiograms also showed a normal sinus rhythm (Tr. 386, 400, 431, 437). Dr. Lopez, however, did not acknowledge the January

14

2009 and February 2011 EF results or the later electrocardiograms in his opinions and based his findings on the older test results from May 2007 and July 2008, both well before her alleged disability onset date of February 17, 2009 (Tr. 439). Accordingly, this was a proper basis for discounting Dr. Lopez's opinions.

The plaintiff also contends that the fact that her heart failure fluctuated between Class I and Class II is further evidence that her heart failure showed no permanent improvement (pl. brief at p. 13). As noted above, under the NYHA Functional Classification, Class I heart failure encompasses "[p]atients with cardiac disease but resulting in no limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea or anginal pain," and Class II heart failure encompasses "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea or anginal pain." *See* AHA website (www.heart.org/HEARTORG/Conditions/HeartFailure/ AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp#) (last visited July 7, 2014). The ALJ specifically cited Dr. Lopez's records indicating that the plaintiff's heart condition fluctuated between Class I and Class II heart failure (Tr. 34). The ALJ noted that in patients with Class II heart failure "physical activity results in fatigue, palpitation or dyspnea," but further found that the plaintiff was able to engage in physical activity without difficulty, citing the plaintiff's many daily activities as will be discussed below (Tr. 33-35). The undersigned finds that this was an appropriate consideration by the ALJ.

The plaintiff next argues that the ALJ's use of the plaintiff's daily activities to discredit Dr. Lopez's opinion was in error (pl. brief at pp. 14-15). The ALJ cited the plaintiff's ability to cook, wash dishes, do some laundry, fold clothes, sweep, occasionally dust, clean the kitchen, drive, attend church every Sunday, visit her aunt, go to the grocery store once or twice a week, go out to eat once or twice a month, and go to a music concert once a week where she sits in a chair (Tr. 32, 34-35). The plaintiff argues that the ALJ

erred by not asking follow-up questions about the extent and duration to which she could perform these activities. The ALJ asked the plaintiff about her daily activities and gave her the opportunity to testify without restriction about those activities (Tr. 102-05). The plaintiff did not testify or otherwise indicate that such activities were limited in any way. Thus, the ALJ was justified in relying on this testimony as stated.

The plaintiff next argues that the ALJ improperly relied on the fact she was not in acute distress as evidence contradictory to Dr. Lopez's finding of disabling functional limitations, noting that Dr. Lopez did not opine that she was completely incapacitated and that such an opinion is not required for a finding of disability (pl. brief at pp. 13-14; *see* Tr. 34-35). The plaintiff contends that her heart issues are chronic, rather than acute, and thus the ALJ's reliance on such evidence was in error (pl. reply at pp. 5-7). However, the context of the ALJ's comment is important. The ALJ set out the plaintiff's varied daily activities, including shopping, doing housework, visiting family, attending church once a week, and exercising, and noted that the plaintiff had never presented to Dr. Lopez or any emergency facility in acute distress after performing such activities (Tr. 33-35). Moreover, the ALJ noted that, in November 2009, Dr. Lopez stated that the plaintiff was exercising daily and had "no chest discomfort or dyspnea or palpitations" (Tr. 35 (citing Tr.374)). As argued by the Commissioner, courts have affirmed ALJ decisions assigning less than controlling weight to treating physician opinions concerning a claimant's heart condition where the ALJ relied, in part, on treatment notes showing that the claimant was in "no acute distress." *See Butters v. Colvin*, No. 12-cv-2071-LRR, 2013 WL 4482709, at *9 (N.D. Iowa Aug. 19, 2013). Accordingly, ALJ's reliance on this as a single factor of many is entirely appropriate.

The plaintiff then argues that "[t]here is no indication that the ability to make a light breakfast is inconsistent with the need to rest away from the workstation for significantly more than an hour" per workday (pl. brief at p. 15). This argument is without

16

merit.  The ALJ did not find that this single activity was determinative as to Dr. Lopez's opinion. Rather, it was one of many activities he cited that he found were inconsistent with a finding of disability (Tr. 33-35). As noted above, he also found that the plaintiff's failure to report any distress or other problems (other than mild dyspnea) after performing those same physical activities (especially walking and exercising) was probative of a non-disabling condition. These daily activities are the type of activity often used to discredit subjective claims and treating physician opinions based on such claims. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) ("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life.") (citation omitted); *cf. Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (an ALJ may accord little weight to a treating physician's opinion based mainly on a plaintiff's subjective complaints). The ALJ combined the fact that the plaintiff was fairly active each day with the numerous medical records and other reasons for discrediting Dr. Lopez's opinion to reach his final decision based on the entire record. Accordingly, this allegation of error is without merit.

The plaintiff next argues that the ALJ's reference to Dr. Lopez's March 2011 statement being obtained for litigation purposes was improper (pl. brief at pp. 15-16).   In a recent case in this district, the Honorable David C. Norton, United States District Judge, held as follows: "The court does not foreclose the possibility that whether a medical opinion is procured by attorney referral may sometimes be a factor in the weight given to that opinion; however, that fact alone is insufficient to establish substantial evidence for discounting the [the examining physician's] opinion in this case." *Jordan v. Colvin*, No. 8:12-cv-1676-DCN, 2013 WL 5317334, at *7 (D.S.C. Sept. 20, 2013) (citing *Lester v. Chater*, 81 F.3d 821 (9th Cir. 1995) and *Hinton v. Massanari*, 13 F. App'x 819, 824 (10th Cir. 2001) (holding that an ALJ may question the credibility of a doctor's opinion where legal counsel solicited his or her opinion, but cannot "automatically reject the opinion for that reason alone")). Here, the ALJ considered numerous other factors in his decision to give

17

little weight to Dr. Lopez's opinion (Tr. 33-35). Importantly, as discussed in detail above, the outdated, pre-alleged-onset-date testing, and not more recent testing indicating improvement, and the numerous medical records indicating that the plaintiff displayed few, if any, functional limitations due to her heart condition upon examination, were the primary factors relied upon by the ALJ. Accordingly, the undersigned finds that this allegation of error is without merit. *See Jones v. Astrue*, No. 8:11–cv–00796–JFA–JDA, 2012 WL 3135410, at *13 (finding that ALJ's decision to give little weight to treating physician's opinion was based upon substantial evidence where one factor was that the treating physician's opinion as to plaintiff's ability to work a full day was contained only in a form completed for plaintiff's counsel), *adopted by* 2012 WL 3135270 (D.S.C. Aug. 1, 2012). Moreover, even if the ALJ erred by considering whether the statement was prepared in anticipation of litigation, the undersigned finds that such error was at most harmless as the ALJ gave several valid reasons for discounting Dr. Lopez's opinion. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

The plaintiff next argues that the ALJ erred in relying on Dr. Lopez's references in treatment notes to the plaintiff "doing well" in discounting Dr. Lopez's opinions (pl. brief at pp. 16-19). The plaintiff cites *Kellough v. Heckler*, 785 F.2d 1147, 1153 (4th Cir. 1986), for the proposition that such notations must be read in context. The undersigned finds that this is exactly what the ALJ did here. The ALJ considered Dr. Lopez's treatment notes in the context of the plaintiff's, at worst, Class II heart failure; her daily activities; the improvement in her EF results; treatment notes showing little-to-no functional limitations upon examination (Tr. 292, 332, 346-47, 348-49, 374-75, 376-77, 378-79, 383, 385-86, 388-89, 390-91, 392-93, 394, 395-96, 400, 430-31, 434, 436-37); treatment notes showing

18

no chest pain, regular heart rhythms, no chest discomfort, no palpations, normal apex impulse, normal heart sounds, no murmurs, no intercostal retraction or use of accessory muscles, normal sinus rhythm and/or no rales, no rhonci, no wheezes (Tr. 292, 332, 346-47, 348-49, 374-75, 376-77, 378-79, 383, 385-86, 388-89, 390-91, 392-93, 394, 395-96, 400, 430-31, 434, 436-37); and treatment notes after the alleged onset date showing the plaintiff stated she exercised daily without difficulty (Tr. 374, 376, 383). Moreover, while the plaintiff concedes that her doctors stated that she was doing well "from time to time" (pl. brief at p. 18), the record illustrates that her doctors (including Dr. Orr, who is not affiliated with Dr. Lopez) consistently recognized that she was "doing well," improved, or more, both before and after her alleged onset date (Tr. 274, 345, 346, 348, 374, 376, 378, 380, 383, 385, 386, 388, 390, 392, 394, 395, 417, 429, 434, 436, 437, 464). Further, her treating medical providers did not just say she was "doing well," they indicated that she was "doing amazingly well" (Tr. 374, 388) and "great" (Tr. 383, 392, 434). Also, notably, Dr. Lopez stated the following in his March 2011 clarification statement, "In most of our office entries, I or my assistant say that [the plaintiff] is 'doing well' or is 'exercising daily,' or something similar. We mean that she is dong well or exercising well considering the low function of her heart. *We have an ejection fraction number that establishes the limitations we have indicated without question*" (Tr. 439) (emphasis added). However, the EF numbers relied upon by Dr. Lopez were from 2007 and 2008, and he did not even mention the more recent improved numbers. Given this context, the undersigned finds that the ALJ did not err in considering the notations showing that the plaintiff was "doing well."

The plaintiff also contends that the ALJ erred by not explaining his statement that "[s]uch routine course of treatment and findings do not support [Dr. Lopez's] medical opinion" (pl. brief at p. 19). As argued by the Commissioner, this was a conclusory sentence wrapping up the ALJ's previous, quite-lengthy discussion of the evidence showing that the plaintiff did not have disabling limitations (Tr. 34). That discussion included the

19

length of time between Dr. Lopez's second opinion and his non-emergency, routine followup treatment of the plaintiff; notations stating the plaintiff was consistently "doing well"; and the plaintiff having normal heart exams with no chest pain, Class II limitations, normal heart sounds, normal heart rhythm, and no murmurs (Tr. 34). Accordingly, the ALJ did not err in this regard.

Based upon the foregoing, the court finds the ALJ adequately indicated and explained the weight he assigned to Dr. Lopez's opinion, and substantial evidence supports his findings.

### *Residual Functional Capacity*

The plaintiff next argues that the ALJ erred in failing to include a limitation in the RFC that she needed a restroom break every 30 minutes (pl. brief at pp. 22-23). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

20

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  *Id.*

The plaintiff bases her argument on her hearing testimony and function reports where she stated that her medication causes her to need excessive bathroom breaks (pl. brief at pp. 21-22). The ALJ acknowledged that the plaintiff "indicated that she had to use the restroom every 30 minutes," along with subjective allegations of dizziness, fatigue, and inability to sit too long (Tr. 28). As pointed out by the plaintiff, the ALJ also noted that she took Lasix (Tr. 24), which is a diuretic.  The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC assessment (Tr. 28-30).  Here, the only record evidence supporting a limitation requiring excessive bathroom breaks as a side effect from her medication is the plaintiff's subjective hearing testimony and functional reports (*see, e.g.*, Tr. 96, 188, 200, 214). As argued by the plaintiff (pl. reply at p. 14), the ALJ specifically explained why he rejected her subjective complaints of dizziness, fatigue, and difficulty sitting too long, but he did not specifically discuss his reasons for rejecting her complaint of needing to use the bathroom excessively (*see* Tr. 29-33),  However, in his discussion of the plaintiff's credibility, the ALJ noted generally that the plaintiff "listed her medications in her disability report and noted that she did not experience any side effects from the medications" (Tr. 30 (citing Tr. 158); *see also* Tr. 33) and further that "the record is clear that claimant did not mention to any of her treating doctors that she was experiencing such side effects (Tr. 30). "One strong indication

21

of the credibility of an individual's statement is their consistency, both internally and with other information in the record." SSR 96-7p, 1996 WL 374186, at *5. There does not appear to be a (and the plaintiff cites no) single notation in the medical records from the relevant time period where she complains to her treating medical professional that she needs to use the bathroom excessively. Indeed, the only mention of excessive urination appears to be from August 30, 2005 (nearly four years before alleged onset of disability), where the plaintiff's medical professional stated that the plaintiff had "no real increased frequency" with urination (Tr. 457).   Based upon the foregoing, the undersigned finds that the ALJ did not err in rejecting the plaintiff's purely subjective allegation of a need for excessive bathroom breaks.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 14, 2014
Greenville, South Carolina

22